USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 97-1354 MANUEL MERCADO-BONETA, ET AL. Plaintiffs, Coappellants, DR. ELLIOT M. FERNANDEZ Codefendant, Coappellant v. ADMINISTRACION DEL FONDO DE COMPENSACION AL PACIENTE through the Insurance Commissioner of Puerto Rico, Codefendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT  FOR THE DISTRICT OF PUERTO RICO [Hon. Salvador E. Casellas, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, and _____________ Hill* and Gibson,** Senior Circuit Judges, _____________________ ___________________ Alberto J. Perez-Hernandez, with whom Rafael E. Garcia-Rodon was __________________________ ______________________ on brief, for appellants. Juan A. Moldes-Rodriguez, Counsel for Administracion del Fondo de ________________________ Compensacion al Paciente (Patient's Compensation Fund Administration), for appellee.  ____________________ September 10, 1997 ____________________  ____________________ * Hon. James C. Hill, of the Eleventh Circuit, sitting by designation. ** Hon. John R. Gibson of the Eighth Circuit, sitting by designation. LYNCH, Circuit Judge. This case raises questions LYNCH, Circuit Judge. _____________ under the Contract Clause of the United States Constitution concerning a government's power to regulate insurance companies facing insolvency by barring claims asserted after a particular date by insureds. If that power is upheld, then Dr. Fernandez is essentially uninsured on the malpractice claim and it may be that the malpractice plaintiffs will recover nothing regardless of the merits of their claim.  Manuel Mercado-Boneta brought a medical malpractice action against Dr. Elliot Fernandez and Fernandez's insurer, the Patient's Compensation Fund Administration ("PCFA"). Dr. Fernandez also claimed over against PCFA. PCFA moved for dismissal on the grounds that, inter alia, PCFA had been __________ dissolved by an act of the legislature and was no longer liable on Dr. Fernandez's insurance policy. The district court granted the motion. Dr. Fernandez and Mercado-Boneta appeal jointly from that dismissal, arguing that the act of the legislature violates the Contract Clause of the United States Constitution. We find no constitutional violation, and affirm. I. During the time of the alleged malpractice, Dr. -2- 2 Fernandez was covered by PCFA under an occurrence policy.1 However, PCFA was abolished before Mercado-Boneta filed his claim against Dr. Fernandez.2 The Legislature of the Commonwealth of Puerto Rico abrogated PCFA by Act of Dec. 30, 1986, Act No. 4, 1986 P.R. Laws 869 ("Act No. 4"), stating  ____________________ 1. An occurrence policy, which provides coverage for occurrences within the policy period regardless of when the claim is made, is distinguished from a claims-made policy, which only covers the insured for claims that are actually made during the policy period.  2. Manuel Mercado-Boneta and his wife Milagros Molina, on behalf of their minor daughter Veronica Mercado-Molina, filed their medical malpractice claim against Dr. Fernandez and his insurance companies on June 24, 1992, almost eight years after the alleged malpractice. Veronica was born on January 1, 1983, and was treated by Dr. Fernandez from that point until the end of June, 1984. Plaintiffs' complaint alleges that Veronica developed a high fever in early 1984, and was taken several times to Dr. Fernandez who prescribed medications, but refused to hospitalize Veronica. Not satisfied with Dr. Fernandez's treatment of their daughter, plaintiffs took Veronica to another physician who immediately hospitalized the child. Plaintiffs allege that Dr. Fernandez was negligent in failing to properly diagnose Veronica's condition and in failing to hospitalize her. They claim that Dr. Fernandez's negligence caused Veronica to suffer severe physical disability and emotional distress, including the permanent loss of approximately 75% of her hearing in both ears, speech impairment, loss of future income, and emotional problems associated with living with a physical handicap. (Plaintiff's complaint, appendix pp. 36-37). Plaintiffs allege total damages in the amount of $1,600,000. Dr. Fernandez denies the allegations of negligence, and submits that Veronica's hearing impairment was the likely result of head trauma Veronica suffered when she fell from a slide in January of 1986. The record is sparse regarding when plaintiffs first became aware of Veronica's hearing and speech problems. It appears, however, that they were aware of the problem by August of 1986, when Veronica's pediatrician referred her to a hearing specialist for evaluation of possible hearing impairment. (report of Dr. Zapata, record) -3- 3 that PCFA was not adequately fulfilling its intended purpose and was at risk of imminent insolvency. The operations of PCFA were endangered and the insureds and their patients were at risk of not being compensated for their losses. Id. at ___ 871 ("Statement of Motives"). Despite the legislature's dissolution of PCFA, Mercado-Boneta sued PCFA3 as an insurer of Dr. Fernandez.4 PCFA moved for dismissal on the grounds that it had been dissolved by Act No. 4, that it lacked funds to assume financial responsibility for claims, and that it was immune from suit in Federal Court under the Eleventh Amendment. The district court granted PCFA's motion to dismiss on the first ground alone. The court found that PCFA was legally extinct, and that Act No. 4 did not permit the Insurance Commissioner, as PCFA's legal representative, to honor claims filed against PCFA subsequent to its abolition on December 30, 1986. Because Mercado-Boneta filed his claim against Dr. Fernandez later than December 30, 1986, the Insurance Commissioner was held not responsible to Dr. Fernandez for any liability he incurred as a result of Mercado-Boneta's claim. The court  ____________________ 3. Act No. 4 directs the Insurance Commissioner of Puerto Rico to represent PCFA in matters pending before PCFA or in actions involving PCFA in the courts. Act No. 4, 3, 1986 P.R. Laws 871, 885. As a result, the Insurance Commissioner represents PCFA in this action. 4. The law of Puerto Rico permits a plaintiff to sue defendant's liability insurer directly. 26 L.P.R.A. sec. 2003. -4- 4 also found that PCFA's successor for certain purposes, the Insurers' Syndicate, was not responsible for any claims filed against PCFA. Both Mercado-Boneta and Dr. Fernandez moved for reconsideration of the dismissal of PCFA on the grounds that Act No. 4, as interpreted by the district court, violated the Contract Clause of the United States Constitution. The district court held that although Act No. 4 did substantially impair a contractual obligation, the Act was reasonable and necessary to an important public purpose, and thus did not violate the Contract Clause.  II. A. As an initial matter, we note that we have jurisdiction to resolve the merits of this case. PCFA has raised this issue on appeal. PCFA argues that because it is an "arm of the state," and because the suit is one potentially involving money damages, the Eleventh Amendment bars a federal court from hearing this claim against it. The parties raised this issue in the district court, but that court did not reach the issue, disposing of the suit against PCFA on other grounds. Whether PCFA is an "arm of the state" for Eleventh Amendment (or, for that matter, Contract Clause) purposes is a difficult question. Because we readily find -5- 5 that Act No. 4 bars suit against PCFA for claims filed after Dec. 30, 1986, and that such a result does not violate the Contract Clause, we pretermit resolution of this jurisdictional issue. See Norton v. Mathews, 427 U.S. 524, ___ ______ _______ 530-32 (1976) (where merits can be readily resolved in favor of the party challenging jurisdiction, resolution of complex jurisdictional issue may be avoided); Birbara v. Locke, 99 _______ _____ F.3d 1233, 1237 (1st Cir. 1996). B. We review de novo orders allowing a motion to ________ dismiss for failure to state a claim. Aulson v. Blanchard, ___________________ 83 F.3d 1, 3 (1st Cir. 1996). It is clear, constitutional issues aside, that Act No. 4 bars the claims of both Dr. Fernandez and Mercado-Boneta. At the time that Mercado- Boneta brought his malpractice claim against Dr. Fernandez, the Legislature of the Commonwealth of Puerto Rico had expressly abolished PCFA by Act No. 4, and replaced it with the Insurers' Syndicate. Act No. 4 at 3, 1986 P.R. Laws 871, 885. PCFA was no longer legally capable of fulfilling its obligations under the insurance policy. The Act further provided that the Insurance Commissioner of Puerto Rico would oversee the implementation of the newly formed Insurers' Syndicate, "it being understood, that the Syndicate shall not assume financial responsibility for any claims filed against -6- 6 the abolished Patient's Compensation Fund Administration." Id. According to the plain language of this statute, the ___ Insurers' Syndicate was not the successor in interest of PCFA for purposes of assuming PCFA's liabilities, and could not be held liable for claims arising under policies issued by PCFA. Nor could the Insurance Commissioner be held liable as PCFA's representative for claims filed against PCFA subsequent to the enactment of Act No. 4. Although the Act provides that the Insurance Commissioner shall continue to be responsible for claims and procedures initiated with PCFA on or before the enactment of Act No. 4, it makes no provision for claims filed with PCFA after the enactment of Act No. 4. Id. Act No. 4 exempts PCFA from liability on malpractice ___ claims filed after December 30, 1986, through the Insurers' Syndicate, the Insurance Commissioner, or otherwise.  C.  Mercado-Boneta5 and Dr. Fernandez argue that Act No. 4 nonetheless violates the prohibition in Article 1,   ____________________ 5. Mercado-Boneta lacks standing to assert a Contract Clause claim, as he has no contractual relationship with PCFA. See ___ General Motors v. Romein, 503 U.S. 181, 186-87 (1991) (the ______________ ______ first step in a Contract Clause analysis is determining whether a contractual relationship in fact exists); McGrath _______ v. Rhode Island Retirement Board, 88 F.3d 12, 16 (1st Cir. ______________________________ 1996) (in a Contract Clause analysis, "a court must first inquire whether a contract exists"). Dr. Fernandez does have standing, however, so we analyze the issue.  -7- 7 10, cl. 1 of the United States Constitution, that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts. . . ." Mercado-Boneta and Fernandez assert that under Dr. Fernandez's occurrence policy with PCFA, PCFA was contractually obligated to reimburse Dr. Fernandez for future claims arising out of negligent acts which occurred during the time the policy was in effect. They argue that because Act No. 4 prevents them from seeking performance from PCFA under the contract, the Act substantially impairs a contractual obligation. They further contend that Act No. 4 is not reasonable and necessary to an important public purpose.  The threshold issue in Contract Clause analysis is "whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'" General Motors Corporation v. Romein, 503 U.S. 181, 186 ____________________________ ______ (1991) (quoting Allied Structural Steel Co. v. Spannaus, 438 ___________________________ ________ U.S. 234, 244 (1978)). This inquiry is broken down into three distinct parts: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Id. If we find that a law does substantially ___ impair a contractual relationship, we will nevertheless uphold the law if it is "reasonable and necessary to an important public purpose." United States Trust Company of _______________________________ -8- 8 New York v. New Jersey, 431 U.S. 1, 25 (1976); see also ________ ___________ ___ ____ McGrath v. Rhode Island Retirement Board, 88 F.3d 12, 16 (1st _______ _____________________________ Cir. 1996) (citing Energy Reserves Group v. Kansas Power & ______ _____________________ _______________ Light, 459 U.S. 400, 411-12 (1983)). This inquiry is more _____ searching than the rational basis review employed in Due Process or Equal Protection analysis. Although deference is due to the legislature, and weight is given to the legislature's own statement of purposes for the law, a court must undertake its own independent inquiry to determine the reasonableness of the law and the importance of the purpose behind it. As noted in McGrath, "a state must do more than _______ mouth the vocabulary of the public weal in order to reach safe harbor . . . ." 88 F.3d at 16.  Because the parties do not raise the issue on appeal, we assume arguendo that a contract between PCFA and Dr. Fernandez indeed existed.6 The parties also agree that  ____________________ 6. We note, however, that in Contract Clause analysis, where the state or a state agency is a party to the allegedly impaired contract, the existence of a contract is not a matter of state contract law, but of federal law. It is not clear whether appellants seek to characterize PCFA as an arm of the state or as a private insurance company. If PCFA is viewed as an arm of the state, in order to find that the state has committed itself to a contractual obligation, there must be a "clear indication that the legislature intends to bind itself in a contractual manner." Parker v. Wakelin, ______ _______ 1997 WL 436704 (1st Cir. Aug. 11, 1997). This requirement is referred to as the "unmistakability doctrine". Id.  ___ Even where the state is not alleged to be a party to the contract, the question of whether a contract exists for Contract Clause purposes is still a question of federal, rather than state law. See General Motors v. Romein, 503 ___ _______________ ______ -9- 9 Act No. 4 impairs the contractual relationship between PCFA and Dr. Fernandez, and that that impairment is substantial, under the second and third prongs of the analysis.  As to whether any impairment is substantial, we note that in Contract Clause analysis, the expectations of the parties to the alleged contract play an important role in determining the substantiality of the contractual impairment. Energy Reserves Group v. Kansas Power and Light Co., 459 U.S. _____________________ __________________________ 400, 416 (the complaining party's reasonable expectations had not been impaired by a statute, and so the statute did not violate the Contract Clause, although it altered the parties' obligations). A key factor in determining the parties' expectations is whether the parties were operating in a heavily regulated industry. Id. at 411 ("In determining the ___ extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past.") (citing Allied Structural Steel Co., 438 U.S. ___________________________ at 242, n. 13). In Energy Reserves, the Supreme Court held _______________ that a Kansas statute imposing certain regulations on oil and gas contracts did not impair existing contractual obligations between an oil company and a public utility. 438 U.S. at  ____________________ U.S. 181, 186 (1992) ("The question whether a contract was made is a federal question for purposes of Contract Clause analysis . . . and 'whether it turns on issues of general or purely local law, we cannot surrender the duty to exercise our own judgment.'") (quoting Appleby v City of New York, 271 _______ ________________ U.S. 364, 380 (1926)).  -10- 10 416. The Court found that because the parties were operating in a heavily regulated industry, and could readily foresee future regulation involving the subject matter of their contract, their expectations under the contract were not significantly affected. Id.  ___ The parties here were also in a heavily regulated context. Insurance companies in Puerto Rico operate under the highly detailed and comprehensive Insurance Code of Puerto Rico. 26 L.P.R.A. 201 et seq. Among its numerous and extensive provisions, the Code permits the Insurance Commissioner to liquidate insolvent insurance companies and establish procedures for the resolution of claims against the company. 26 L.P.R.A. 4002, 4008, 4019. The breadth of Puerto Rico's regulation of the insurance industry was acknowledged in Gonzalez v. Media Elements, Inc., 946 F.2d ________ ____________________ 157 (1st Cir. 1991) ("Puerto Rico has constructed a comprehensive framework for the liquidation of insolvent insurance companies and the resolution of claims against them."); see also Garcia v. Island Program Designer, 791 F. ________ ______ _______________________ Supp. 338, 341, rev'd on other grounds, 4 F.3d 57 (1st Cir. ______________________ 1993) (noting that the Puerto Rico insurance scheme is "an intricate and highly specialized administrative system, adopted by the Commonwealth of Puerto Rico to regulate the life of insurance companies from incorporation to dissolution . . . . [It] provides a comprehensive program for the -11- 11 rehabilitation and liquidation of domestic insurance companies . . . ."). Dr. Fernandez was aware, when he contracted with PCFA for medical malpractice insurance, that the subject matter of the contract might well undergo further regulation, including potential cancellation of the contract in the event of PCFA's insolvency. See Veix v. Sixth Ward ___ ____ __________ Bldg. & Loan Ass'n, 310 U.S. 32, 38 (1940) (noting that when ___________________ one "purchase[s] into an enterprise already regulated in the particular to which he now objects, he purchase[s] subject to further legislation upon the same topic."). Just as the legislature created PCFA because of an insurance crisis, it was reasonable to expect that the legislature could terminate PCFA's existence in the event that PCFA did not fulfill its purposes, or a new crisis ensued. This is exactly what transpired, and we do not believe that these events were unforeseeable.  Whether or not there is a substantial contractual impairment7 involved in this case, we find, turning to the  ____________________ 7. Dr. Fernandez correctly points out the dangers that Contract Clause analysis would be enervated if the mere fact of regulation meant there was always foreseeability of more regulation and thus no substantial impairment. We need not decide whether there was indeed a "substantial" impairment here, given the ease of the analysis of the Commonwealth's justifications for any impairment. In that context, we note that such an impairment was foreseeable, and that, in turn, has some bearing on the level of scrutiny to which Act No. 4 is subjected. See Allied Structural Steel Co., 438 U.S. at ___ ___________________________ 245 ("The severity of impairment measures the height of the hurdle the state legislation must clear.");see also Energy _________ ______ Reserves, 459 U.S. at 411 ("The severity of the impairment is ________ -12- 12 fourth part of the Contract Clause analysis, that Act No. 4 was reasonable and necessary to an important public purpose. Although apparently absolute on its face, "[t]he Contract Clause's prohibition of any state law impairing the obligation of contracts must be accommodated to the State's inherent police power to safeguard the vital interests of its people." Energy Reserves, 459 U.S. at 410. A court's task _______________ is "to reconcile the strictures of the Contract Clause with the 'essential attributes of sovereign power' necessarily reserved by the States to safeguard the welfare of their citizens." United States Trust, 431 U.S. at 20 (quoting Home ___________________ ____ Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435 (1934)).  __________________ _________ The Commonwealth's interests are revealed by the statutory scheme. The legislature originally created PCFA in 1976, to "solve the problem of medical and hospital malpractice risks." Act No. 4, 1986 P.R. Laws 869, 869 ("Statement of Motives"). To achieve its goals, the legislature created two insurance structures: the Joint Underwriting Association ("JUA") and PCFA. Id. The JUA was ___ "composed of all insurers licensed to contract accident insurance in Puerto Rico, and its purpose was to provide medicohospital professional liability insurance for medical professionals and health service institutions that could not  ____________________ said to increase the level of scrutiny to which the legislation will be subjected.") (citing Allied Structural __________________ Steel, 438 U.S. at 245). _____ -13- 13 obtain said insurance on the open market." Id. The goal of ___ the JUA was to distribute profits and losses evenly among all insurance underwriters.  The Commonwealth established the second insurance structure, PCFA, to "provide medicohospital professional liability coverage in excess of seventy-five thousand dollars ($75,000) per claim, furnished by the market and/or the Association, up to a limit of one hundred and fifty thousand dollars ($150,000)." Id. at 870. PCFA was to be funded by ___ premiums imposed on the insured, in much the same manner that private insurance companies are funded. Neither the JUA nor PCFA proved effective in achieving the Commonwealth's goals. In enacting Act No. 4, the Commonwealth sought to eradicate both structures and create a new, improved insurance structure called the Insurers' Syndicate. We quote, as did the District Court, from the "Statement of Motives" in Act No. 4: It has been proven that the Patient's Compensation Fund has serious faults which sooner or later shall make it a totally inoperative system. It does not have an adequate capital structure, so that it lacks the resources to face adverse fluctuations in loss occurrence. The mechanism of the demand which the Fund has to cover operational deficits is inadequate because the law establishes a maximum limit to the additional contribution that can be levied in a fiscal year.  On the other hand, if contingencies occur such as a high incidence (even in the case of losses under the $150,000 -14- 14 limit) or high severity, especially in limits between one hundred and fifty thousand ($150,000) and five hundred thousand ($500,000) dollars, the Fund could find itself without adequate resources to absorb its losses. In view of the ascending trend in the incidence and severity of the losses, the postponement of the payment for subsequent fiscal years could only endanger the Fund's operations for said years and bring about the protests of the insured (because of high costs) and the victims who will not receive their payment in time. Id. at 871. The legislature reasonably concluded that if ___ PCFA were not dissolved, it would continue to incur liabilities and obligations which it would not be able to meet. Under Contract Clause analysis, a court must consider whether the proposed justification in fact serves public ______ interests and whether its mechanisms to serve those interests reflect reasonable and necessary choices.  __________ _________ Act No. 4 is in stark contrast to the narrowly focused, private interest-oriented law that was struck down in Allied Structural Steel Company v. Spannaus, 438 U.S. 234 _______________________________ ________ (1978). The Supreme Court there invalidated a law which mandated certain pension rights for certain employees, regardless of what the individual employment contracts or pension plans provided, because the law had an "extremely narrow focus," and was not enacted "to protect a broad societal interest rather than a narrow class." Id. at 248-49 ___ (The law "applies only to private employers who have at least -15- 15 100 employees, at least one of whom works in Minnesota, and who have established voluntary private pension plans . . . . And it applies only when such an employer closes his Minnesota office or terminates his pension plan."). The Commonwealth was not legislating on behalf of private interests when it enacted Act No. 4, and sought only to protect the legitimate interests of the public in having a well-functioning medical malpractice insurance system.  The necessity analysis inquires whether the Commonwealth "impose[d] a drastic impairment when an evident and more moderate course would serve its purposes equally well." United States Trust Co., 431 U.S. at 31. And the ________________________ reasonableness inquiry requires a determination that the law is "reasonable in light of the surrounding circumstances." Id. The Supreme Court has indicated that different levels of ___ deference are afforded to a legislature's determination of reasonableness and necessity, depending on whether the contracts at issue are public or private in nature. See U.S. ___ ____ Trust Co., 431 U.S. at 25-26. If the contract is a private _________ one, then "[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." United States Trust Co., 431 U.S. at ________________________ 22-23. On the other hand, "[w]here the contract allegedly impaired is one created, or entered into, by the state -16- 16 itself, less deference8 to a legislative determination of reasonableness and necessity is required, because 'the State's self-interest is at stake.'" Parker v. Wakelin, 1997 ______ _______ WL 436704 (quoting United States Trust Co., 431 U.S. at 25- _______________________ 26).  Here, we find that although PCFA was created by the Commonwealth, the insurance contracts PCFA entered into were essentially more akin to private contracts than public ones. We thus accord considerable deference to the Commonwealth's assessment of the reasonableness and necessity of Act No. 4. We believe the real issue in determining the level of deference given to a legislative determination of reasonableness and necessity is not so much whether the state is arguably a nominal party to the contract, but whether the state is acting in its own pecuniary or self-interested capacity by impairing a contractual obligation it has undertaken. See United States Trust Co., 431 U.S. at 26 ("If ___ _______________________ a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide  ____________________ 8. However, even where public contracts are at issue, some deference is due a legislature. See Local 589, Amalgamated ___ ______________________ Transit Union v. Massachusetts, 666 F.2d 618, 642 (1st Cir. _____________ _____________ 1981) (even where public contracts are involved, courts are not required to "reexamine de novo all the factors underlying _______ the legislation and to make a totally independent determination" regarding the necessity and reasonableness of the law).  -17- 17 no protection at all."); Parker v. Wakelin, 1997 WL 436704 ______ _______ (1st Cir.) (state assessment of necessity and reasonableness is given less deference where its own self-interest is at stake). If the state has in fact altered none of its own financial obligations, then the legislative decision deserves significant deference because the state is essentially acting not according to its economic interests, but pursuant to its police powers.  The question then, is whether and to what extent the Commonwealth of Puerto Rico has lessened its own financial obligations by abrogating PCFA. The answer is that it has not done so at all. The Commonwealth created PCFA, but empowered it to act as an ordinary insurance company. PCFA entered into insurance contracts and conducted its affairs as a more or less independent entity, overseen by a board of directors. Act of May 30, 1976, Act No. 74, sec. 1, 41.050(2), 1976 P.R. Laws 223, 228-29 ("Act No. 74"). PCFA derived its funds from premiums imposed on the insureds, Act No. 74, at sec. 1, 41.050(1)(b), 41.060, and there is no indication that the Commonwealth ever intended to utilize state funds to satisfy any of PCFA's insurance obligations. In fact, Act No. 74 provided that in the event that the amount of money contributed to PCFA by the insureds were "not sufficient to meet the claims made against [PCFA] in a specific year," the Commonwealth would not contribute any -18- 18 funds, but rather "the Board [of PCFA would] require an additional proportionate contribution of all the participants for that fiscal year." Id. at 41.060(4). By creating PCFA, ___ the Commonwealth sought not to provide state funds to insure medical professionals, but merely to set up an insurance scheme that would provide the proper setting in which to resolve the medical malpractice insurance crisis that was occurring at the time. Because the Commonwealth was never obligated to fund PCFA, when PCFA began to fail it was the public welfare, not the Commonwealth's bank account, that stood to lose.  Act No. 4 was plainly reasonable and necessary. In Chicago Life Ins. Co. v. Needles, 113 U.S. 574 (1885), the ______________________ _______ Supreme Court upheld against Contract Clause attack a legislative decision to liquidate an insolvent insurance company. In that case, the Court stated: But can it be possible that the state, which brought this corporation into existence for the purpose of conducting the business of life insurance, is powerless to protect the people against it, when . . . its further continuance in business would defeat the object of its creation, and be a fraud upon the public, and on its creditors and policy-holders? . . . The [law in question] does not contain any regulation respecting the affairs of any corporation of Illinois which is not reasonable in its character, or which is not promotive of the interests of all concerned in its management. -19- 19 Id. at 582. In response to the claim that the liquidation ___ violated the contract rights of policy-holders, the Court noted that "it would be a doctrine new in the law that the existence of a private contract of the corporation should force upon it a perpetuity of existence contrary to public policy, and the nature and objects of its charter." Id. at ___ 584.  That the Act itself was reasonable and necessary does not end the analysis. In the end, Dr. Fernandez's real complaint is that, because of the claims bar date, his claim is not among those which will be funded out of the wind-down of PCFA. In an attempt to limit the financial and administrative burdens of concluding the affairs of the dissolved PCFA, the legislature provided that existing claims would be honored, while claims filed with PCFA after the enactment of Act No. 4 would not. Although this legislative solution may appear unfair to those physicians who paid for occurrence policies with PCFA and whose claims were not made with PCFA before the claims bar date, it was not unreasonable under the circumstances. In a sense, Act No. 4 sought to accomplish a sort of legislative triage. That is, it sought to make an equitable distribution of limited resources by providing for existing, but not future claims.  The Commonwealth did not impose "a drastic impairment when an evident and more moderate course would -20- 20 serve its purposes equally well." United States Trust Co., ________________________ 431 U.S. at 31. We cannot say that the Commonwealth was obligated to fund PCFA until all potential occurrence claims had been filed, regardless of PCFA's imminent insolvency and inefficacy. What the legislature has done in this case is not unlike the situation in bankruptcy wherein creditors must file their claims against a debtor's estate within a relatively short time period in order to have their claims recognized. See Rule of Bankr.Proc. 3002(c) (in chapter 7 ___ liquidation proof of claims shall be filed within 90 days of creditors' meeting). The time limitations for filing claims against a bankrupt have been held to create an absolute bar against asserting the claim, rather than merely an issue of priority. See, e.g., Robinson v. Mann, 339 F.2d 547, 549 _________ ________ ____ (5th Cir. 1964) (time limitations for filing claims against debtor's estate "operate as an absolute bar against creditors who seek to present their claims beyond the [bar date]."); Norris Grain Co. v. United States, 81 B.R. 103, 106 (Bkrtcy. ________________ ______________ M.D. Fl. 1987) (claims bar date is 'in the nature of a statute of limitations [which] must be strictly observed.'") (quoting In re Kay Homes Inc., 57 B.R. 967, 971 (Bkrtcy. S.D. ____________________ Tex. 1986) (alterations in original)). The purpose behind  the claims bar date in bankruptcy, as in the case before us, is "to provide the debtor and its creditors with finality" and to "insure the swift distribution" of the liquidated -21- 21 estate. In re Schaffer, 173 B.R. 393, 398 (Bkrtcy. N.D. Ill. ______________ 1994) (quoting In re Zimmerman, 156 B.R. 192, 199 (Bkrtcy. _______________ W.D. Mich. 1993)). See also In re Kolstad, 928 F.2d 171, 173 _____________ (5th Cir. 1991) ("The deadlines have a purpose: they enable a debtor and his creditors to know, reasonably promptly, what parties are making claims against the estate and in what general amounts."). "[A]lthough aware that a bar date, like other limitation periods, would inevitably cause hardship on those who failed to act timely, Congress decided that the goal of finality is of greater benefit to the public than any benefit derived from allowing individual exceptions to the bar date." Norris Grain Co., 81 B.R. at 106 (citing Hoos & _________________ ______ Co. v. Dynamics Corporation of America, 570 F.2d 433, 439 (2d ___ _______________________________ Cir. 1978)); see also Hoos & Co., 570 F.2d at 439 (noting ________ __________ that permitting bankruptcy court to consider allowing late claims in individual cases would "put the bankruptcy courts in the unenviable position of indefinitely having to consider claims" and that such a scenario "would destroy the objective of finality which Congress obviously intended to promote."). The same principles are involved here. The legislature assigned to the Insurance Commissioner the task of liquidating PCFA and distributing its assets. There was a strong interest in rapidly resolving and quantifying all claims against PCFA. If the Insurance Commissioner were -22- 22 required to accept claims against the liquidated PCFA indefinitely that would clearly contravene the legitimate legislative goal of finality, and could well delay distribution of funds to any claimant. Cf. In re Schaffer, ___ ______________ 173 B.R. at 398 ("If creditors of any stripe were permitted to file claims at their discretion . . . . Many estates would be impossible to administer."). In addition to the administrative difficulties involved in permitting the continued filing of claims against PCFA, due to the limited availability of funds, known claimants might be required to await the filing of future claims before they could collect on their own. Absent a claims bar date, neither the affairs of PCFA nor the interests of pending claims could be finalized. It was reasonable for the legislature to set a cut-off date after which time claims against PCFA would not be honored, and Dr. Fernandez's claim fell on the wrong side of that line. We recognize that this places Dr. Fernandez, Mercado-Boneta, and others like them in an unfortunate situation. We also recognize, however, the legislature's legitimate purpose in setting a claims bar date, and find that it was reasonable and necessary under the circumstances. D. -23- 23 We hold that Act No. 4 bars plaintiff's suit against PCFA, and that Act No. 4 does not violate the Contract Clause of the United States Constitution. We affirm the District Court's dismissal of this action.  -24- 24