**In re CARLETON WOOLEN MILLS, Debtor.**

**Frank A. Russell, et al, Plaintiffs,**

**v.**

**Allied Textile Companies, PLC, Defendant.**

**Bankruptcy No. 00–10214.
Adversary No. 00–1073.**

United States Bankruptcy Court, D. Maine.

Jan. 22, 2003.

Michael A. Fagone, Esq., Bernstein, Shur, Sawyer & Nelson, Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Debtor.

P.J. Perrino, Jr., Esq., Augusta, ME, Peter S. Plumb, Esq., Murray, Plumb & Murray, Rufus E. Brown, Esq., Brown & Burke, Portland, ME, for trustee.

Richard P. Olson, Esq., Perkins, Olson & Pratt, PA, Portland, ME, for Creditor Committee.

Donald F. Fontaine, Esq., Jonathan S.R. Beal, Esq., Fontaine & Beal, P.A., Portland, ME, for Plaintiffs.

Lawrence Coe Lanpher, Kirkpatrick & Lockhart, LLP, Washington, DC, U. Charles Remmel, Esq., Portland, ME, for Defendant.

### Memorandum of Decision

JAMES B. HAINES, JR., Chief Judge.

This matter is before me on remand from the district court for a determination whether application of the Maine Severance Pay Statute to a 1998 collective bargaining agreement between the plaintiffs and their employer, Carleton Woolen Mills, Inc. ("Carleton"), results in an unconstitutional impairment of contract.

### Background

Plaintiffs filed their complaint in state court in August 2000. The defendant, Allied Textile Companies, PLC ("Allied"), invoking federal jurisdiction as a consequence of Carleton's bankruptcy filing, removed the matter to this court. *See* 28 U.S.C. § 1452. The complaint alleges that Carleton violated the Maine Severance Pay Statute, 26 M.R.S.A. § 625–B (West 1988 & Supp.2002), and that Allied is liable as a statutorily-designated responsible party.[1]

### 1. The Initial Summary Judgment Ruling

Following several months of pretrial skirmishing, Allied moved for partial summary judgment on April 4, 2001. In its motion, Allied sought to bar the claims of certain subclasses of plaintiffs.[2] After a brief delay to allow the Maine Attorney General to intervene for the purpose of defending the constitutionality of the Sev-

---

1. Carleton has been a wholly-owned subsidiary of Allied since 1994. *See infra* note 4; *State v. L.V.I. Group,* 1997 ME 25, ¶¶ 12–13, 690 A.2d 960 (upholding the constitutionality of the statute's definition of "employer").

2. This case deals only with union employees; there is also pending a companion case, *Douglass et al v. Allied Textiles Companies PLC,* Adv. Proc. No. 00–1049, that deals with non-union personnel. *Douglass* is currently stayed pending a resolution of the instant matters.

erance Pay Statute, *see* 28 U.S.C. § 2403(b), I ruled from the bench on October 16, 2001. I denied summary judgment on some of the grounds Allied asserted in this and in the *Douglass* case, but with regard to the Severance Pay Statute I determined that, in order to avoid declaring the statute unconstitutional, I would apply it prospectively only, to contracts entered into *after* its effective date.[3] *E.g., State v. L.V.I. Group,* 1997 ME 25, ¶ 8, 690 A.2d 960 (1997) (when possible, statutes should be construed to preserve their constitutionality). Because the collective bargaining agreement in force at the time of the alleged layoffs was entered into *before* the effective date of the statute, I ruled the version of the statute applicable to plaintiffs' claims would be the pre–1999

version.[4] This in turn meant that the safe harbor provision of that statute, 26 M.R.S.A. § 625–B(3)(B) (West 1988) (providing that employees with contracts for severance pay benefits were not eligible to recover under the statute), insulated Allied from liability because the 1998 CBA does contain a severance benefit.[5]

Because my ruling applied to all unionized employees, this case ended when I entered judgment on January 9, 2002. Plaintiffs appealed.

## 2. The District Court Ruling

On appeal, the district court ruled that applying the Severance Pay Statute as amended in 1999 [6] does *not* implicate the issue of retroactivity because the focus

---

**3.** The union plaintiffs and Carleton entered into collective bargaining agreements in 1995 (the "1995 CBA") and 1998 (the "1998 CBA"). The term of each was 3 years. The Severance Pay Statute was amended in April, 1999, effective October 1, 1999. Although there is a dispute as to the exact date that operations at Carleton ceased, there is no dispute that it was after the effective date of the 1999 amendment to the Severance Pay Statute, or that the 1998 CBA was in effect.

**4.** The Severance Pay Statute in effect in 1998, when the 1998 CBA was negotiated and entered into, provided that:

Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

26 M.R.S.A. § 625–B(2) (West 1988). "Employer" is defined in the statute as "any person who directly or indirectly owns and operates a covered establishment. For purposes of this definition, a parent corporation is considered the indirect owner and operator of any covered establishment that is directly owned and operated by its corporate subsi-

dy." 26 M.R.S.A. § 625–B(1)(C) (West 1988). There is no dispute that Carleton Woolen Mills qualifies as a "covered establishment" under the statute.

The Severance Pay Statute contains a safe harbor for employers: Under the pre–1999 version of the statute employers will not be liable if "[t]he employee is covered by an express contract providing for severance pay; ... or [the] employee has been employed by the employer for less than 3 years." 26 M.R.S.A. § 625–B(3)(B) and (D) (West 1988). Under the Severance Pay Statute in effect after the 1999 amendment, however, the safe haven applied only if "[t]he employee is covered by an express contract providing for severance pay *that is equal to or greater than the severance pay required by this section.* ..." 26 M.R.S.A. § 625–B(3)(B) (West Supp. 2002) (language added by amendment emphasized).

**5.** The 1995 CBA contained a severance benefit for union workers of $150 for each year worked. The 1998 CBA contained a similar benefit of $275 for each year of service for each union worker with more than one year of seniority.

**6.** In other words, with a significantly more limited safe harbor provision that now requires a minimum level of benefits. *See* 26 M.R.S.A. § 625–B(3)(B) (West Supp.2002).

should not be on the execution of the 1998 CBA (i.e., prior to the 1999 amendment), but rather on the "operative event" that gave rise to the cause of action (i.e., the "termination" of a "covered establishment" under the Severance Pay Statute). Memorandum of Decision and Order (Carter, J.) at 10 (*citing Liberty Mutual Ins. Co. v. Superintendent of Ins.*, 1997 ME 22, 689 A.2d 600, 602 (1997)). The district court concluded that the operative event was the final termination of operations at the Carleton plant.

Although the parties disagree as to when exactly the Carleton plant ceased operating, there is no question that it occurred after the Severance Pay Statute's 1999 amendment became effective.[7]

The district court remanded the case for a determination whether the 1999 amendment unconstitutionally impairs the contractual rights and obligations of the parties to this suit when applied to the claims of those union personnel laid off in 1999 and 2000 as the Carleton plant closed.

### Discussion

Under the version of the Severance Pay Statute that was in effect when the 1998 CBA was negotiated and entered into between plaintiffs and Carleton there would be no statutory liability (for either Carleton or Allied) because the statute's safe harbor provision extended to "an express contract providing for severance pay [.] ..." 26 M.R.S.A. § 625–B(3)(B) (West 1988). The 1998 CBA is such a contract. *See supra* notes 3–5. The 1999 amendment, however, established a minimum severance benefit below which even "express contracts" may not go. In other words, post–1999, the safe harbor extends only to "express contracts" that provide for severance pay "that is equal to or

greater than the severance pay required by" statute. 26 M.R.S.A. § 625–B(3)(B) (West Supp.2002). The parties agree that if the post–1999 statute is applied (as was mandated by the district court's ruling, absent a constitutional impairment), Allied faces the prospect of statutory liability to Carleton's former employees.

### 1. Allied's Argument

Allied argues that under Supreme Court and First Circuit jurisprudence the Maine Severance Pay Statute's 1999 amendment unconstitutionally impairs its contractual relationship with the plaintiffs. Citing *Parker v. Wakelin*, 123 F.3d 1, 4–5 (1st Cir.1997), Allied asserts that the 1999 amendment to 26 M.R.S.A. § 625–B(3)(B) ("Mitigation of severance pay liability"): (i) substantially impairs a contractual relationship, (ii) without a legitimate public purpose, and (iii) in an unreasonable and inappropriate fashion.

Allied contends that, despite the fact that the 1998 CBA was between plaintiffs and Carleton, it nonetheless has standing to assert the constitutional impairment issue as a result of: (i) the *existence* of a contract (as opposed to status as a *party* to the contract) that previously provided it a defense to Severance Pay Statute liability, and (ii) the provisions of the statute itself.

### 2. Plaintiffs' Argument

Plaintiffs principally contend that Allied lacks standing to raise the impairment of contract issue. They posit that since Allied is not a party to the 1998 CBA, it has no obligations or rights under the contract. Thus, the 1999 amendment can affect no rights or obligations to which Allied can lay claim. They emphasize the distinction

---

7.  The parties contend that the Carleton plant finally terminated operations sometime between December 29, 1999, and May 15, 2000.

In my ruling of October 16, 2001, I determined that material factual issues exist as to the exact date.

between, on the one hand, Allied's statutory liability, and on the other, the absence of any *contractual* interest (belonging to Allied) that warrants constitutional protection.

### 3. Standing

██ I agree with plaintiffs that Allied is without standing to raise the Contract Clause as a defense to its liability under the Maine Severance Pay Statute.[8]

██ The Contract Clause of the United States Constitution states that "No state shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10, cl. 1. Contract Clause analysis requires consideration of, first, whether a change in state law results in " 'a substantial impairment of a contractual relationship.' " *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109 (1992) (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)). The "substantial impairment" inquiry has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Romein*, 503 U.S. at 186, 112 S.Ct. 1105. In the event all three elements are satisfied, the court must then consider "whether the impairment is nevertheless justified as 'reasonable and necessary to serve an important public purpose.' " *Parker v. Wakelin*, 123 F.3d 1, 5 (1st Cir.1997) (*quoting United States Trust Co. v. New Jersey*, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977)).

Normally, the first two prongs of the substantial impairment analysis are "unproblematic." *Romein*, 503 U.S. at 186, 112 S.Ct. 1105. As in *Romein* and *Parker*, however, there is no need in this case to consider the question of impairment or substantiality, "because the [Defendant] fail[s] to demonstrate the existence of a contractual relationship protected by the Contract Clause." *Parker*, 123 F.3d at 5. Allied has not cited, and independent research has failed to reveal, a single case that bestows upon non-parties to a contract standing to raise the Contract Clause as a defense to statutory liability.

██ Allied relies heavily on language in several Contract Clause cases that refers to a "contractual *relationship*," as if somehow that language extends constitutional protection beyond the parties to a contract. I am unconvinced. To begin, such third-party standing would swallow prudential limitations inherent in the standing requirement itself. Moreover, every one of the cases Allied cites, although discussing the contractual "relationship," involved a claim by a party to the contract. *See Romein*, 503 U.S. at 186–87, 112 S.Ct. 1105 (employment contracts entered into after collective bargaining between petitioners and respondents); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (pension contract between appellant and its employees); *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190–91 (1st Cir. 1999) (local ordinance prevented one of several co-plaintiffs from fulfilling contrac-

---

8. The Maine Constitution provides that the "Legislature shall pass no ... law impairing the obligation of contracts...." Me. Const. art. I, § 11. The Maine Supreme Judicial Court has held that the Contract Clause of the Maine Constitution "tracks the language of the cognate federal provision," and therefore the state courts are to "give consideration to relevant decisions of the federal courts in determining" its meaning. *Clark v. Rust Eng'g Co.*, 595 A.2d 416, 419 (Me.1991). I will focus my analysis on the United States Constitution and the federal court decisions interpreting it as the state provision is *pari materia. Id.*

tual obligations); *McGrath v. Rhode Island Retirement Board*, 88 F.3d 12, 19–20 (1st Cir.1996) (assuming without deciding that an offer of a retirement plan to petitioner/employee by state has contractual significance for purposes of the Contract Clause); *see also Parker*, 123 F.3d at 5, 9 (plaintiffs failed to "demonstrate the existence of a contractual relationship" and thus there was "no plausible contract clause claim[,]" where plaintiffs failed to show that state statute gave rise to contract rights between them and state). The reason this is so seems perfectly clear. "The Contracts Clause prohibits a state legislature from amending any law in a way that works a *substantial impairment of contractual obligations previously undertaken.*" *McGrath*, 88 F.3d at 17 n. 6 (emphasis added). In other words, what the Contract Clause protects is the rights and obligations of contracting parties, those holding rights to benefits, or undertaking defined obligations, under a bargain they have struck.

Although Allied received an incidental benefit (safe harbor protection from a Severance Pay Statute claim) as a result of the 1998 CBA between plaintiffs and Carleton under the version of the statute then in effect, it was not a benefit for which *Allied* bargained.[9] Moreover, Allied incurred no obligations under the 1998 CBA.[10] Allied's potential liability to the plaintiffs is *solely* a result of state law.

Allied asserts that the statute itself confers it with Contract Clause standing. It argues that since it is an "employer" within the meaning of the statute, it is entitled to all "contractual defenses under the Statute as if it were the contracting party." Although I agree that Allied is entitled to all *statutory* defenses available to an employer under the statute, that is a far cry from entitling it to *contractual* defenses, and constitutional standing, where, as here, it is not a contracting party. Statutory liability, in and of itself, does not confer contractual defenses. The leap is not one I am prepared to make.[11]

Allied further attempts to bolster its argument arguing that its role is akin to that of a chapter 7 trustee under the Bankruptcy Code. It asserts that the statutory framework of the Code gives a trustee standing to assert Contract Clause defenses in the place of a debtor. Thus, Allied argues, because it is lassoed within the statute's definition of "employer," it

---

**9.** Defendant makes no claim that it somehow gains standing as an intended beneficiary of the contract between plaintiffs and the Carleton. Indeed, it specifically disavows any *contractual* rights or obligations under either the 1995 or the 1998 collective bargaining agreements. *See Motorsport Eng'g, Inc. v. Maserati SPA*, 316 F.3d 26, 2002 WL 31857366, at *3 (1st Cir. Dec.20, 2002) (recognizing that third-party beneficiaries to a contract are not liable for the performance of the signatories to the contract, nor do they have any contractual obligation to either). Thus, I need not consider whether third-party beneficiary interests could uphold a Contract Clause challenge.

**10.** Illustrative of this point: In the absence of the Severance Pay Statute (and barring corporate veil-piercing), Allied would have no severance liability to the plaintiffs, whereas Carleton, which signed the contract, most certainly would.

**11.** I understand that this point raises the prospect of a potentially anomalous result under state law. Conceivably, a "statutory employer" situated similarly to Allied, and without a bankrupt subsidiary "direct employer," might be exposed to statutory liability in circumstances where the subsidiary's severance pay liability would be limited by contract and the pre–1999 safe harbor (assuming the subsidiary could mount a successful Contract Clause challenge to the 1999 amendment's operation). However, that is a different case than the one before me. I do not agree that Allied's standing *in this case* can be substantiated by hypotheticals or conjecture.

stands in the shoes of Carleton here, "akin to a Chapter 7 trustee." To begin, as a Chapter 7 debtor, Carleton has its own trustee. It is not Allied. *See* Case No. 00–10214 United States Bankruptcy Court, District of Maine, docket entry no. 127, Sept. 22, 2000.

Moreover, Allied's analogy holds no water. A chapter 7 trustee is required by the Bankruptcy Code to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(1). "Property of the estate" under the Code is all-encompassing, 11 U.S.C. § 541(a); *Davis v. Cox (In re Cox)*, 274 B.R. 13, 23 (Bankr.D.Me.2002), and it specifically includes legal claims, *Howe v. Richardson*, 193 F.3d 60, 61 (1st Cir.1999). *See generally* 11 U.S.C. § 323(a) ("[t]he trustee in a case under this title is the representative of the estate"); 11 U.S.C. § 323(b) (providing that "[t]he trustee ... has capacity to sue ... and be sued"); Fed. R. Bankr.P. 6009 ("[w]ith or without court approval, the trustee ... may ... defend any pending action or proceeding by or against the debtor, or commence and prosecute any action or proceeding in behalf of the estate before any tribunal."). Thus under the statutory framework of the Bankruptcy Code the trustee succeeds to the *debtor's* rights in property, be it a couch, a cause of action, or a defense that belongs to the debtor as a result of a contract to which the debtor is a party. For all intents and purposes the trustee acts as the debtor in those circumstances.[12]

Here, Allied does not stand in Carleton's shoes. By including Allied within the statutory definition of "employer," without excluding other parties that may also meet the definition, the statute imposes liability wholly independent of the liability of another. Indeed, I have no doubt that, if they chose (and assuming Carleton was not bankrupt), plaintiffs here could have brought suit against *both* Carleton and Allied.[13]

A final point deserves mention: The parties vigorously disagree over the significance of a First Circuit decision, *Mercado–Boneta v. Administracion del Fondo de Compensacion al Paciente*, 125 F.3d 9 (1st Cir.1997). *Mercado–Boneta* was a malpractice action brought by a patient's representative against a doctor and the doctor's liability insurer. *Mercado–Boneta*, 125 F.3d at 10–11. The doctor also claimed over against the insurer. *Id.* The insurer, a public entity created by the Puerto Rican Legislature, was abolished by the Legislature prior to the time the plaintiff brought suit. *Id.* In the district court, "[b]oth [patient and doctor] moved for reconsideration of the dismissal of [the insurer] on the grounds that [the abolishing legislation], as interpreted by the district court, violated the Contract Clause of

---

**12.** In both its "Memorandum of Points and Authorities in Support of Defendant's Renewed Motion for Summary Judgment" and "Defendant's Reply to: (I) the Attorney General's Brief in Support of the Maine Severance Pay Statute; and (II) Plaintiffs' Opposition to Defendant's Motion for Summary Judgment," (hereafter "Defendant's Reply Brief")Allied cites *In re Garrison*, 108 B.R. 760 (Bankr.N.D.Okla.1989), for the proposition that chapter 7 trustees have standing to litigate Contract Clause defenses as the *representative* of creditors who were parties to the contract at issue. Although Allied failed to cite relevant subsequent authority, *Walker v.*

*Mather (In re Walker)*, 959 F.2d 894, 899–900 (10th Cir.1992) (repudiating *Garrison* on grounds other than whether the trustee has standing to raise the Contract Clause as a defense to exemption claims under state law), the analysis is in any event unhelpful to it, because it is not a statutory representative of any party. The Severance Pay Statute imposes liability on Allied directly.

**13.** Although Plaintiffs surely are limited to one recovery, the statute imposes separate *liability* for that recovery on more than one party.

the United States Constitution." *Id.* at 11. Citing *Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328, the First Circuit ruled that the patient had no standing "to assert a Contract Clause claim, as he holds no contractual relationship with [the insurer]." *Mercado–Boneta,* 125 F.3d at 12 n. 5.

Allied would distinguish *Mercado–Boneta* on the ground that there "is no evidence that the Puerto Rican statute treated the third party plaintiff as a party to the contract for purposes of the statute." Defendant's Reply Brief, at 3–4. Likewise, however, there is "no evidence" here that the Maine Legislature treated Allied as *a party to* the 1998 CBA. What is crystal clear, however, is that the Legislature imposed *statutory* liability on parent corporations of covered establishments. But only as a party to the collective bargaining contract would Allied be provided protection from intervening state law under the Contract Clause of the U.S. (or Maine) Constitution.[14]

### Conclusion

Because Allied is without standing to raise the Contract Clause of the United States Constitution as a defense to its statutory liability under the Maine Severance Pay Statute, 26 M.R.S.A. § 625–B (West 1988 & Supp.2002), and because the district court has mandated application of the Severance Pay Statute as it existed after the 1999 amendments, Alllied's motion for summary judgment, based on its Contract Clause argument, is DENIED.[15]

---

14. Today's determination leaves it unnecessary to consider the question whether, if Allied had standing, the Contract Clause would operate in its favor.

15. I will leave for discussion by the parties Judge Carter's observation regarding the potential that the third-shift Plaintiffs' claims might be revived by today's ruling. *See* Memorandum of Decision and Order (Carter, J.) at 15, n. 10.